Filed 1/14/26  In re M.S. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re M.S. et al., Persons Coming Under the Juvenile Court Law. | B345724 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>Michelle R.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. Nos. 23LJJP00112A–B) |

APPEAL from orders of the Superior Court of Los Angeles County.  Debra L. Gonzales, Commissioner.  Affirmed.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Michelle R. (Mother) appeals from the orders terminating parental rights over her two minor children under Welfare and Institutions Code[1] section 366.26. On appeal, Mother argues the juvenile court erred in failing to apply the beneficial parental relationship exception to the termination of her parental rights. (§ 366.26, subd. (c)(1)(B)(i).) She also asserts the juvenile court and the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with the inquiry requirements of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California law. We conclude that neither of Mother's arguments has merit, and accordingly, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Section 300 petition

Mother and Michael S. (Father) are the parents of M.S., a boy born in March 2020, and J.S., a girl born in February 2021. Father is not a party to this appeal.

On April 6, 2023, DCFS filed a dependency petition for M.S. and J.S. under section 300, subdivisions (a) and (b), alleging that the children were at substantial risk of harm based on Father's history of domestic violence against Mother, and Mother's failure to protect the children from Father's conduct. While investigating the domestic violence allegations, DCFS learned that Mother had been recently arrested for driving a stolen vehicle and evading arrest. DCFS also learned that, a few days after Mother's release from jail, then three-year-old M.S.

---

[1] Unless otherwise stated, all further undesignated statutory references are to the Welfare and Institutions Code.

2

wandered away from the home while Mother was sleeping, and was found unattended on a street by a bystander.

At the April 20, 2023 detention hearing, the juvenile court detained the children from both Mother and Father, and granted them monitored visitation pending adjudication of the petition. The following day, DCFS placed the children in the home of their paternal great-grandmother, Sheila R., and paternal great-aunt, Monique J. Mother began having in-person visits with the children four to five times per week and daily telephone calls.

On August 21, 2023, the juvenile court held a combined jurisdictional and dispositional hearing. The court sustained the petition as pled, declared M.S. and J.S. dependents of the court under section 300, subdivisions (a) and (b), and removed the children from both parents. The court granted the parents family reunification services, including monitored visitation with the children. Mother's case plan included on-demand drug testing, a domestic violence support group, an anger management program, a parenting education program, and individual counseling to address case issues.

## 2. Termination of reunification services

Over the next six months, Mother had multiple arrests and periods of incarceration. After serving 120 days in jail for grand theft, she was released in October 2023. She was again incarcerated in December 2023, and was released in January 2024. While in jail, Mother enrolled in parenting education and anger management classes. She also participated in a domestic violence support group, but did not attend individual counseling. Mother tested positive for marijuana on a few occasions, and failed to appear for a number of other drug tests. When Mother was not incarcerated, she attended in-person visits with the

3

children, and was attentive and appropriate during the visits. The children consistently greeted Mother with hugs and kisses, and enjoyed spending time with her. During this period, the children remained placed with their paternal great-grandmother and great-aunt, and developed a strong and nurturing bond with them.

At a six-month review hearing held on February 20, 2024, the juvenile court found that the parents were not in substantial compliance with their case plans, and that continued jurisdiction over the children was necessary. The court ordered an additional period of reunification services for both parents.

During the next six months of services, Mother was again incarcerated on a grand theft charge. As a result, she did not have any in-person visits with the children. She did, however, maintain telephone contact with them three times per week. As of August 2024, Mother had completed a parenting education course and recently enrolled in a drug treatment program, but had not participated in any other court-ordered services. During this period, the children continued to do well in the home of their paternal great-grandmother and great-aunt, and remained closely bonded with their caregivers.

On August 14, 2024, the juvenile court held a contested 12-month review hearing. The court found that neither Mother nor Father substantially complied with their case plans, and that return of the children to their custody would create a substantial risk of detriment. The court terminated the parents' reunification services, and set the matter for a section 366.26 permanency planning hearing.

4

### 3. Termination of parental rights

In November 2024, DCFS filed a permanency planning report for the children, and recommended adoption by their paternal great-grandmother and great-aunt as the permanent plan. DCFS reported the children had formed a significant bond with their caregivers and were happy in their home. The caregivers were able to meet the children's physical, mental, and emotional needs, and to provide them with love, support, and stability. The caregivers were also deeply committed to the children and wanted to provide them with permanency through adoption.

In a status review report filed in January 2025, DCFS indicated that Mother was incarcerated in a federal prison, and as a result, was unable to have in-person visits with the children. Mother continued to have telephone contact with the children on a frequent basis. However, after their calls with Mother, the children tended to have tantrums and difficulty calming down.

In a supplemental report filed in March 2025, DCFS continued to recommend adoption as the children's permanent plan. At the time of the report, M.S. was five years old and J.S. was four years old, and the children had been residing with the paternal great-grandmother and great-aunt for almost two years. They were deeply bonded with their caregivers, and appeared happy and secure in their home. The caregivers continued to maintain a safe, loving, and stable home environment for the children and were committed to providing them with a permanent home through adoption.

In its supplemental report, DCFS noted that Mother had been incarcerated since February 2024. Prior to her incarceration, Mother had consistent in-person visits with the

children. She was observed to be attentive and affectionate toward the children during the visits, and would comfort, nurture, feed, and read to them. The children enjoyed these visits with Mother and responded well to her. Since her incarceration, Mother maintained frequent telephone contact with the children. She called them on the telephone almost every day, and recently had two video calls with them. The caregivers reported that Mother was appropriate with the children during the calls, and would sing with them and help them recite their ABCs. However, the caregivers also observed that the children would act out after the calls as if they were angry that they could not see Mother, and that they had less tantrums when they did not have contact with her.

In its report, DCFS assessed that the children shared a significant attachment to Mother, but that Mother's repeated periods of incarceration negatively affected the children and prevented her from providing them with stability. In assessing whether terminating Mother's parental rights would be detrimental to the children, DCFS noted that "Mother's long-term incarceration and prior criminal behavior which led to her incarceration on multiple occasions makes termination of parental rights less detrimental." DCFS further noted that the fact that the "caregivers have repeatedly stated that they intend to allow the children to maintain in-person and telephone contact with the parents [also] . . . makes termination of parental rights less detrimental."

On April 21, 2025, the juvenile court held the section 366.26 permanency planning hearing. Mother's counsel asked the court not to terminate parental rights over the children based on the beneficial parental relationship exception. Her

6

counsel argued that Mother had maintained regular contact with the children when she was not in custody, and that the children had a close bond with her. Mother's counsel also asserted that, in deciding whether to terminate parental rights, the court could not consider the caregivers' statements that they would allow continued contact between Mother and the children. Counsel for DCFS and counsel for the children joined in requesting that the court terminate parental rights. Counsel for DCFS argued that the children had been in the home of their current caregivers for two years, and that the children's relationship with Mother did not outweigh their need for permanency through adoption.

After hearing the argument of counsel, the juvenile court found that the beneficial parental relationship exception to the termination of parental rights did not apply. Citing the three-factor test in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), the court stated: "With regard to visitation, and I will say that the report acknowledges that Mother, when she was not incarcerated, did have regular visitation with the minors, and even when she was incarcerated, she made sure to have telephonic contact with the children almost every[]day. So I think that she does meet that first prong of having regular visitation. Unfortunately, she created the barriers herself to not being able to have in-person visitation by engaging in conduct that caused her to be incarcerated. [¶] And although there is some bond, clearly, between the mother and the children, I don't find it to be the kind of bond that is so beneficial to the children. They have been out of her care for two years. Based on all of the information that I see in all of the reports, they are—it is the court's assessment that although there is some bond with the mother, that they are very bonded to the caregivers. And so even

7

if Mother were to meet the second prong of *Caden C.*, I must find that the termination of parental rights is outweighed by the benefit of these very—still very young children to have permanency with the—that would be provided by adoption. [¶] So for those reasons, I find that terminating the parent/child relationship will not be detrimental to the children, and, therefore, . . . that no exception to adoption applies in this case." The court terminated parental rights over M.S. and J.S., and ordered adoption by the caregivers as the children's permanent plan.

Mother filed a timely appeal from the orders terminating her parental rights.

4.      **ICWA inquiry and findings**

In their initial interviews with DCFS in March 2023, both parents denied having any Indian ancestry. At their first appearances before the juvenile court, each parent submitted a Parental Notification of Indian Status (ICWA-020) form in which they indicated that they had no known Indian ancestry. At those hearings, the juvenile court also inquired whether the parents had any Indian ancestry, and both Mother and Father denied that they did. At the April 20, 2023 detention hearing, the juvenile court found it had no reason to know that ICWA applied, but directed DCFS to interview any known maternal and paternal relatives regarding ICWA as part of its ongoing duty of inquiry.

In May 2023, DCFS interviewed the children's maternal grandmother, Michelle C., and the paternal great-grandmother, Sheila R. Both of these relatives reported that there was no Indian ancestry in their family. The maternal grandmother further indicated that she had no contact with the maternal

8

grandfather and believed he was incarcerated.  DCFS also reinterviewed Mother, who again denied any Indian ancestry.  In addition to these interviews, DCFS also attempted to contact Father and the paternal grandmother, O.S., regarding ICWA, but was unable to reach them.  At the August 21, 2023 jurisdictional and dispositional hearing, the juvenile court found that, based on the interviews conducted by DCFS, there was still no reason to know that ICWA applied, but directed the agency to provide any new information regarding ICWA in its next report.

In January 2024, prior to the six-month review hearing, DCFS again inquired of Mother, the maternal grandmother, and the paternal great-grandmother regarding ICWA.  Each of these individuals continued to deny any known Indian ancestry in their family.  At that time, DCFS also made another attempt to inquire of the paternal grandmother, but her phone had been disconnected.

On August 27, 2024, following the setting of the section 366.26 hearing, the juvenile court signed an order prepared by counsel for DCFS, directing DCFS to interview all known and available extended family members regarding ICWA, and to report on the results of its interviews prior to the section 366.26 hearing.  In each subsequent report that it filed with the court, DCFS included a summary of the efforts that it made to interview extended family members regarding ICWA in May 2023 and January 2024.  However, there is no indication in the record that DCFS attempted to conduct any additional interviews regarding ICWA prior to the section 366.26 hearing.  At the April 21, 2025 section 366.26 hearing, the juvenile court again found there was no reason to know that ICWA applied to the case.

9

**DISCUSSION**

**1.    Beneficial parental relationship exception**

Mother contends the juvenile court erred when it found the beneficial parental relationship exception did not apply to the termination of her parental rights.  Mother claims the exception applied because the evidence showed that she maintained regular contact with the children, they had a positive bond, and termination of that bond would be detrimental to the children. We conclude the juvenile court did not err in finding the exception did not apply.

**1.1.    Governing law**

At a hearing under section 366.26, the juvenile court must select and implement a permanent plan for a dependent child, with the express purpose of providing the child a "stable, permanent" home.  (§ 366.26, subd. (b).)  Where there is no probability of reunification with a parent, adoption is the preferred permanent plan.  (*Id*., subd. (b)(1).)  For the court to implement adoption as the permanent plan, it must find, by clear and convincing evidence, that the child is likely to be adopted if parental rights are terminated.  (*Id*., subd. (c)(1).)  Then, in the absence of evidence that a guardianship should be considered, or that the termination of parental rights would be detrimental to the child under one of six enumerated exceptions, the court "shall terminate parental rights." (*Id*., subd. (c)(1).)  These " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Caden C*., *supra*, 11 Cal.5th at p. 631.)

Under section 366.26, subdivision (c)(1)(B)(i), the beneficial parental relationship exception applies when the juvenile court determines that the termination of parental rights would be

10

detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid*.) In *Caden C.*, the California Supreme Court held that a "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

We review the juvenile court's findings for the first two elements—whether the parent has maintained regular visitation with the child and whether the child has a beneficial relationship with the parent—for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) We review the third element— whether termination of parental rights would be detrimental to the child due to the child's relationship with the parent—for abuse of discretion. (*Id*. at p. 640.) The reviewing court will find an abuse of discretion "only when ' " 'the [juvenile] court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

### 1.2. The juvenile court did not err in finding the beneficial parental relationship exception did not apply

In considering the applicability of the beneficial parental relationship exception to this case, the juvenile court found that

11

Mother satisfied the first element of the *Caden C.* test because she maintained regular contact with the children to the extent permitted by her periods of incarceration. However, the court found that Mother did not satisfy the remaining two elements because she failed to show that the children shared a substantial bond with her, or that it would be detrimental to sever that bond when balanced against the benefits of adoption. On appeal, Mother asserts the juvenile court erred in finding that the exception did not apply because the court failed to conduct a careful, fact-specific inquiry into the children's relationship with Mother and whether the termination of that relationship would be detrimental to them. We disagree. Even assuming Mother established the first and second elements of the exception, we conclude the juvenile court did not abuse its discretion in finding that the third element was not satisfied.

In evaluating the third element—whether termination of parental rights would be detrimental to the child—the juvenile court must determine whether "the benefit of placement in a new, adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship' " with the parent. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Id.* at p. 640.) " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Id.* at p. 633.)

Although the evidence showed that the children had an emotional attachment to Mother, the juvenile court reasonably

12

could find that the benefits the children would derive from a permanent, adoptive home outweighed any harm they would experience from the loss of that bond. At the time of the April 2025 section 366.26 hearing, M.S. was five years old and J.S. was four years old, and the children had been out of Mother's care for two years. Shortly after the children were detained from Mother, they were placed with the paternal great-grandmother and great-aunt, and they remained in their care throughout the dependency proceedings. The evidence further showed that the children were closely bonded with their caregivers, readily sought them out for comfort and affection, and relied on them to meet their needs. The caregivers ensured the children had a safe, stable, and loving home environment, and they were committed to providing the children with permanency through adoption. Even though the children enjoyed the time they spent with Mother, they had not had any in-person visits with her since February 2024 due to her incarceration, and their contact was instead limited to daily telephone calls. Therefore, while the children may have had positive interactions with Mother, the evidence demonstrated that they spent a significant portion of their lives outside of her care and did not have the kind of beneficial parent-child relationship that would outweigh " 'the security and the sense of belonging a new family would confer.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

In arguing that the juvenile court erred in ruling on the applicability of the beneficial parental relationship exception, Mother suggests that the court may have improperly relied on the caregivers' statements that they would allow postadoption contact between the children and Mother. "Because terminating parental rights eliminates any legal basis for the parent or child

13

to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Here, DCFS repeatedly noted in its supplemental permanency planning report that the caregivers had stated that they intend to permit the children to maintain contact with Mother. But there is no indication in the record that the juvenile court considered these statements by the caregivers in its ruling, or otherwise based its decision to terminate parental rights on the possibility that the children would have any future contact with Mother.

Mother also claims that the juvenile court improperly considered her failure to progress in services in deciding that the beneficial parental relationship exception did not apply. She specifically points to the court's statement that Mother "created the barriers herself to not being able to have in-person visitation by engaging in conduct that caused her to be incarcerated." However, as our Supreme Court has recognized, "[i]ssues such as those that led to dependency often prove relevant to the application of the exception" because "[a] parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) In this case, the court's statement about Mother's criminal conduct was relevant to the *Caden C.* analysis because Mother's resulting incarceration impacted the children's ability to maintain a substantial, positive attachment to her through regular in-person visits. Contrary to Mother's claim, the record does not show that the juvenile court based its ruling on Mother's lack of progress with her services. Nor did the court compare Mother's attributes as a caregiver to those of the prospective adoptive parents. Rather, the record reflects that the

14

court properly based its decision on whether severing the children's relationship with Mother "would harm the child[ren] to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id*. at p. 634.)

Based on the totality of the evidence before it, the juvenile court reasonably could find that Mother failed to establish that her relationship with the children was "so important to the child[ren] that the security and stability of a new home wouldn't outweigh its loss." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The juvenile court accordingly did not err in finding that the beneficial parental relationship exception did not apply.

## 2.    ICWA inquiry

Mother asserts the juvenile court erred in finding that ICWA did not apply because DCFS failed to comply with its initial duty of inquiry as to the children's paternal extended family.  We conclude the juvenile court's ICWA finding was supported by substantial evidence.

### 2.1.   Governing law

ICWA mandates that "[i]n any involuntary proceeding in a [s]tate court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and the right to intervene. (25 U.S.C. § 1912(a).)  Similarly, California law requires notice to the child's parent, Indian custodian, if any, and the child's tribe if there is "reason to know . . . that an Indian child is involved" in the proceeding.  (§ 224.3, subd. (a).)  Both juvenile courts and child welfare agencies "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300

15

. . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 14.)

At the first appearance of each party, the court must inquire whether that party "know[s] or ha[s] reason to know that the child is an Indian child." (§ 224.2, subd. (c).) Additionally, whenever a child welfare agency takes a child into temporary custody, it must inquire of a nonexclusive group that includes the child, the parents, and extended family members "whether the child is, or may be, an Indian child." (*Id.*, subd. (b)(2).) Extended family members include adults who are the child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

"If the [juvenile] court makes a finding that proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) We generally review the juvenile court's ICWA findings under the substantial evidence test. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

### 2.2. Substantial evidence supported the juvenile court's finding that ICWA did not apply

Mother argues DCFS failed to make an adequate ICWA inquiry as to the paternal side of the children's family, and identifies three paternal relatives that DCFS did not interview regarding ICWA: (1) the paternal grandmother, O.S.; (2) the paternal grandfather; and (3) a paternal aunt named Sky.

The record reflects that DCFS interviewed Father and the paternal great-grandmother, Sheila R., about ICWA, and that

16

they both denied that there was any Indian ancestry on the paternal side of the children's family. The record further reflects that DCFS twice attempted to contact the paternal grandmother, O.S., to inquire about ICWA, but was unable to reach her on each occasion. In May 2023, the dependency investigator called and left messages for the paternal grandmother, but did not receive a response. Then, in January 2024, the case social worker tried calling the paternal grandmother about ICWA, but her phone had been disconnected.

In challenging the adequacy of DCFS's ICWA inquiry, Mother notes that, in August 2024, the paternal grandmother contacted the supervising case social worker about the denial of her RFA application, but she was not asked about ICWA at that time. Mother also notes that, prior to the April 2023 detention hearing, DCFS visited Father's home to serve him with a removal order and was greeted at the door by a paternal aunt, Sky, but did not ask her about ICWA. In addition, Mother asserts that DCFS did not make any effort to locate the paternal grandfather as part of its ICWA inquiry.

However, "section 224.2 'does not require the [child welfare] agency to "find" unknown relatives and others who have an interest in the child, merely to make reasonable inquiries. The operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked.' " (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1140.) "Agencies are already tasked with investigating the circumstances underlying the child's removal and identifying and locating the child's extended family members [citation]; it is a rather simple task to ask those family members about Indian ancestry in this process." (*Id*. at p. 1143.) Our

17

review of DCFS's inquiry is "not a mechanistic analysis of whether the record supports a finding of literal compliance with the statute, but 'whether the ICWA inquiry conducted has reliably answered the question at the heart of the ICWA inquiry: Whether a child involved in a proceeding "is or may be an Indian child." ' " (*In re H.B.* (2023) 92 Cal.App.5th 711, 720.) "In answering this question, we must also consider the limitations on [DCFS's] ability to carry out its inquiry under the particular facts of the case. . . . '[W]e cannot ask [DCFS] to intuit the names of unidentified family members or to interview individuals for whom no contact information has been provided.' " (*Ibid.*)

In this case, DCFS satisfied its duty of inquiry by asking known and available extended family members for whom it had contact information about ICWA. During the dependency proceedings, DCFS inquired of Mother, Father, the maternal grandmother, and the paternal great-grandmother. Each of these family members denied any Indian ancestry. DCFS also made reasonable efforts to inquire of the paternal grandmother. Although DCFS missed opportunities to inquire of the paternal grandmother in the case, the agency did attempt to reach on at least two occasions in May 2023 and January 2024 to ask about ICWA, but she did not return these calls. While no inquiry was made of paternal grandfather, there is nothing in the record to suggest that this relative was known to DCFS given that he is not referenced in any of the agency's reports, and none of the family members that DCFS contacted over the course of the case ever mentioned him. (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1140.) DCFS did briefly speak with the paternal aunt, Sky, while attempting to serve a removal order on Father at his home, but there is no indication that the agency had any further

18

communication with Sky about the case or was in possession of her contact information.  (*Id.* at p. 1143.)  Further, DCFS inquired of Sky's brother (Father) and Sky's grandmother (paternal great-grandmother), so the agency spoke to both a contemporary and an elder for Sky in the family tree about ICWA.

Moreover, given that the paternal great-grandmother denied there was any Indian ancestry in the family, we cannot conclude that DCFS's failure to inquire of these other paternal relatives demonstrated error.  As the people closest to the past, elders generally know more family history than younger people, and are usually the ones to educate younger family members about family ancestry.  On this record, the juvenile court had an adequate basis on which to conclude DCFS fulfilled its inquiry obligations, and that neither DCFS nor the court had reason to know or believe that M.S. or J.S. was an Indian child.  The juvenile court's finding that ICWA did not apply was thus supported by substantial evidence.

## DISPOSITION

The juvenile court's orders terminating parental rights over M.S. and J.S. are affirmed.


VIRAMONTES, J.


I CONCUR:


WILEY, Acting P. J.


19

*DCFS v. Michelle R.* - B345724

**UZCATEGUI, J., Concurring and Dissenting:**


I concur with the majority's determination that the juvenile court did not err in finding the beneficial parental exception did not apply to the termination of Mother's parental rights. However, I dissent from the majority's conclusion that the Los Angeles County Department of Children and Family Services (DCFS) conducted an adequate inquiry into the potential Indian ancestry of the minors, M.S. and J.S.

The record reflects that only two paternal relatives were asked about the minors' potential Indian ancestry, Father and the paternal great-grandmother, Sheila R. However, DCFS had contact information for the paternal grandmother and communicated with her on at least five occasions, but there is no indication that the paternal grandmother was asked about potential Indian ancestry. DCFS argues that the paternal grandmother became "difficult to reach" as the case went on. But the record reflects that the paternal grandmother was interviewed at the inception of the case, on March 2, 2023. DCFS again spoke to the paternal grandmother on April 4 and 19, 2023. The paternal grandmother was evaluated for emergency placement of the minors in April 2023 and again in August 2024. Despite these repeated contacts with the paternal grandmother, it does not appear that she was ever asked about potential Indian ancestry.

"At the first contact with the child and each family member, including extended family members, the county welfare department or county probation department has a duty to inquire

whether that child is or may be an Indian child." (Welf. & Inst. Code, § 224.2, subd. (b)(1).) Here, DCFS did not comply with its obligation to inquire with the paternal grandmother regarding Indian ancestry at first contact with the paternal grandmother, or at any of the other repeated contacts. "Where, as here, the [family member] is readily available, [Welf. & Inst. Code] section 224.2, subdivision (b)(2), requires an inquiry into the child's Indian ancestry." (*In re Claudia R* (2025) 115 Cal.App.5th 76, 90, fn. 6.) This is not a situation where DCFS is asked to " ' "find" unknown relatives. . . . The operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked.' " (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1140.)

Because DCFS did not "interview all reasonably available extended family members," I would conditionally reverse the juvenile court's order terminating parental rights and remand for ICWA compliance. (*In re Claudia R., supra,* 115 Cal.App.5th at p. 81.)

UZCATEGUI, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2